UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BARBARA M. DEPASQUALE d/b/a
HAVENS TOYS,
Plaintiff,

-against-

NAFTULA JACOBOWITZ a/k/a Nat Jacobs a/k/a Matt
Jacob, individually, on behalf of and d/b/a Quality
Encapsulations a/k/a Cure Encapsulations, and/or Throop
57; and THROOP 57, LLC; and SHAINDY JACOBOWITZ
a/k/a Sandy Jacobs, individually and on behalf of and
d/b/a Cure Encapsulations a/k/a Quality Encapsulations;
and LISA MARTIN, individually and on behalf
of Quality Encapsulations,
Defendants.

3:16-cv-100-JAM
**MEMORANDUM IN
OPPOSITION
(CORRECTED)**

Defendants Naftula Jacobowitz a/k/a Nat Jacobs a/k/a Matt Jacob,

individually, on behalf of and d/b/a Quality Encapsulations a/k/a Cure Encapsulations,

and/or Throop 57 and Shaindy Jacobowitz a/k/a Sandy Jacobs individually and on

behalf of and d/b/a Cure Encapsulations a/k/a Quality Encapsulations (collectively,

"Defendants") , by and through their undersigned attorneys, submit this memorandum

in opposition to the motion of plaintiff Barbara M. Depasquale d/b/a Havens Toys

("Depasquale") to dismiss their counterclaim pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure.

ORAL ARGUMENT REQUESTED

<u>Preliminary Statement</u>

Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure permits a party to amend its pleading once as a matter of course within 21 days after service of a motion under Rule 12(b), which defendants have done (Doc. 27).[1] The amended pleading addresses all of the issues set forth in plaintiff's motion or renders them moot. Each issue is addressed in turn.

I.

DEFENDANTS DO NOT ALLEGE DILUTION
<u>IN THE AMENDED COUNTERCLAIMS</u>

In the original answer ("OCC"), defendants alleged a single counterclaim which alleged both unfair competition (OCC ¶9)(15 USC §1125(a) and (b)) and dilution (OCC ¶¶13-19)( 15 USC §1125§(c)). While they believe they could continue to pursue a viable dilution counterclaim, in order to avoid litigation on this point, they have removed the dilution allegations from the amended counterclaims, retaining the unfair competition allegations, which were alleged in the initial counterclaim (Factual Allegations Underlying Affirmative Defenses and Counterclaims, hereafter "Factual Allegations", and OCC ¶9) and not challenged by plaintiff's motion.

Specifically, in both the original and amended counterclaims ("ACC"), defendants allege that Depasquale, on or in connection with goods and services (and

---

[1]     The Court granted defendants' application for an extension of time to amend and oppose the motion to dismiss and they do not rely upon Docs. 24 and 25.

containers for goods), used in commerce false or misleading descriptions of fact, or false or misleading representations of fact, which, in commercial advertising or promotion, misrepresented the nature, characteristics, qualities, or geographic origin of her or another person's goods, services, or commercial activities (OCC ¶ 9(b), ACC First Counterclaim ¶¶36).  Those misrepresentations are specifically pleaded in both documents (OCC Factual Allegations ¶¶34-39; ACC Factual Allegations ¶¶ 36-41, as well as ¶¶ 42-50).  The majority of the misrepresentations concern false reviews and comments (OCC Factual Allegations ¶¶34 and 38; ACC Factual Allegations ¶¶ 36-41), which allegations the motion does not challenge at all.

Defendants further allege Depasquale, on or in connection with goods and services, and containers for goods, used in commerce words, terms, names, symbols, or devices, or any combination thereof, and false designations of origin, which were likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Depasquale with Answering Defendants, and as to the origin, sponsorship, or approval of Depasquale's goods, services, or commercial activities by Answering Defendants (OCC 9(b), ACC First Counterclaim ¶¶36).

In addition to the above, the amended answer alleges three additional counterclaims for trademark infringement (Second Counterclaim ¶¶ 38-42), common law unfair competition (Third Counterclaim ¶¶ 43-48) and the Connecticut Unfair Trade Practices Act (CUTPA) (Fourth Counterclaim ¶¶49-53).

Defendants allege Depasquale has inflicted millions of dollars of damages upon them by:

a. publishing false negative reviews, as well as thousands of false negative comments and votes, regarding Defendants and their products (including Garcinia Cambogia QE) on Amazon and elsewhere;

b. creating a sham business purporting to sell Garcinia Cambogia QE, which was created for the sole purpose of disrupting the business of Defendants, and in which Depasquale violated Amazon's rules regarding drop shipping due to lack of inventory; and

c. making false and misleading claims regarding placing an invisible mark on products.

The specific allegations follow.

<u>Specific Allegations Concerning Publishing False Negative Reviews and Comments</u>

In addition to doing business as Havens Toys, Depasquale uses the name FourofUs[2] to post false negative reviews and comments and is assisted in the above conduct by Morris Cohen and others including competitors of Defendants (ACC Factual Allegations ¶35).

---

[2]       Defendants' primary allegation is that FourofUs is simply a name used by Depasquale. Alternatively, assuming it has any independent existence, Depasquale acted with the assistance of FourofUs.

Amazon encourages customers to review and make comments about products and services they have purchased on Amazon.[3]  A product's rank is heavily dependent on positive or negative reviews and substantially affects sales (¶36).

A reviewer can comment on reviews published by other reviewers.  One technique, repeatedly used by Depasquale/ Havens Toys/FourofUs, was to place false negative comments and votes on every review of every product of Answering Defendants. This not only lowered their product rank, but was readily apparent to and significantly discouraged other reviewers from providing positive reviews.  Amazon repeatedly removed the above reviews and comments but Depasquale/FourofUs repeatedly re-posted them, until Amazon took away her ability to do so (¶37).

Between in or about September and December 2015, for example, Depasquale/FourofUs, placed false negative comments such as the following on Amazon:

> "VERIFIED PURCHASE" can be easily obtained by issuing coupons that often amount for 90-95% of the value which is exactly what this illegitimate company does.
> This company, Quality Encapsulations is in no way legitimate
> FACTS:
> -There is no telephone number for this company
> -There are no email addresses for this company
> -There is no address for this company
> -There are no registered officers of the company

---

[3]        Amazon places restrictions on who can review products.

-The labels on their product declare MADE IN THE USA which they do NOT have to provide their company information to make that claim. Think back to a year ago when the BIG BOX chains had to remove ALL of their products from shelves because labels said MADE IN USA and were actually made in CHINA and INDIA.
-The label on their bottle also says CERTIFIED GMP (Good Manufacturing Practices) which anybody can claim and not have to prove.
-The labels on their products also have no company name, address, phone number or contact number.
-Their products haven't been tested by anyone, let alone the US FDA.
-ALL of the minimal products this company has listed have a saturated level of 5 star REVIEWS.

This company is so deceitful it advertised on GOOGLE to get people to leave reviews in exchange for FREE product. People that leave anything less than 5 stars are bullied by "employees" of this company who threaten them via email using hotmail email address. Most of these "employees" are in other countries with limited understanding of the English language. I know of no professional and legitimate company that uses anything but their own company email addresses. Go read the reviews starting at 1 star, highly informative and mind blowing. Their products could be harmful and/or dangerous for human consumption, do NOT BUY!  (¶38)

Between in or about September and December 2015,

Depasquale/FourofUs, placed false negative comments such as the following on

Amazon: "BUYER BEWARE, this "company" is a total SHAM, read the reviews. There

is no website, no email address and no phone number for this "company". The label on

their bottle has MADE IN USA (which is a lie), CERTIFIED GMP (Good Manufacturing

Practices) which requires NO proof and ZERO information about the "company". The

product is 100% garbage and has GELATIN in it. Could be DANGEROUS TO

CONSUME!" (¶39).

On or about October 24, 2015, Depasquale, using Morris Cohen, placed the following false negative review on Amazon: "Product is worthless and made me sick after 3 days. I was given the product for FREE and supposed to leave a great 5 STAR review but won't. This is a complete crock and product not 100% pure at all, had it tested. DO NOT WASTE YOUR MONEY OR HEALTH!" (¶40)

As set forth in the counterclaims, the Morris Cohen orders were directly drop shipped to addresses other than his own address. Accordingly, he never received the product and could not have legitimately reviewed it (¶41).

<u>Allegations that Depasquale Created a Sham Business Purporting to Sell Garcinia Cambogia QE, which was Created for the Sole Purpose of Disrupting the Business of Defendants; Depasquale Violated Amazon's Rules Regarding Drop Shipping Due to Lack of Inventory</u>

Defendants further allege that, in conjunction with publishing false reviews and comments, Depasquale created a sham business purporting to sell Garcinia Cambogia QE, which was created for the sole purpose of disrupting the business of Answering Defendants. Depasquale violated Amazon's rules regarding drop shipping due to lack of inventory (¶42).

Specific facts are pleaded indicating that the business was a sham. Knowing that defendants offered Garcinia Cambogia QE for $20 on Amazon,

Depasquale offered herself to sell it on Amazon for twice as much, $40.[4] Depasquale's business was not genuine nor could it genuinely compete at twice the price, particularly with a far slower shipping time than Defendants (three weeks versus one or two days). The exceptionally low volume of seller feedback on Amazon indicates that sales were close to non-existent (¶43). Rather, the purpose was to disrupt Defendants' business, including by publishing false reviews and comments.

Specifically, in or about May 2015, Depasquale created what falsely appeared to be an offer to sell Garcinia Cambogia QE on Amazon. Depasquale had no inventory of Garcinia Cambogia QE, never intended to have any and accordingly was unable to ship the product. When Defendants placed orders with her to find out what she was doing, she generated false orders for the product with Answering Defendants, on ebay and Amazon, disguising the source of the purported orders using Morris Cohen (¶44).

Depasquale violated Amazon's Drop Shipping Policy, which prohibits an online retailer from:

- purchasing products from another online retailer and having that retailer ship directly to customers, or

---

[4]      In May 2016, Depasquale purported to offer the same product for $75.

- shipping orders with packing slips, invoices, or other information indicating a
  seller name or contact information, other than the online retailer.

If a seller violates the policy, Amazon can close its account (¶45).

Specifically, Depasquale, using Morris Cohen (also an online retailer),
placed eight orders on Amazon for Garcinia Cambogia QE which were drop shipped,
that is, purchased from Quality Life Essentials, another online retailer, for shipment by
that retailer directly to customers: 111-0585814-6793002, 111-2262011-5618648, 002-
8124746-7887452, 002- 3734075-9785821, 002-2887340-1869017, 107-2300614-5126666, 106-
8534986-0640222, 106-6140323-5043422. Depasquale falsely claimed to Amazon that she
shipped the orders (¶46).

All of the above conduct was for the purpose of damaging and disrupting
Answering Defendants' business, causing confusion as to the Mark and benefiting
competitors of Answering Defendants.  Depasquale had no genuine business involving
Garcinia Cambogia QE and never intended to (¶50).

Allegations Concerning False and Misleading Claims and Trademark
Infringement Regarding Placing Invisible Mark on Products

As set forth above, Depasquale falsely claimed that her company "uses an
invisible mark on all of our product packaging and has distribution contracts with our
manufacturers that uses same invisible company mark on all items before they are

sealed". Depasquale has no such distribution contract with Answering Defendants. Depasquale's claims regarding her mark are false, misleading and confusing (¶48).

<u>Argument</u>

In support of her motion to dismiss, Depasquale argues that defendants misunderstand trademark law, as she has a right to make a first sale of their product. This argument is misplaced for two reasons.

First, in making a motion to dismiss, Depasquale is required to credit defendants' factual allegations, including those indicating that the first sale doctrine does not apply to Depasquale's purported sales. But Depasquale herself claims that she altered the Garcinia Cambogia QE allegedly provided by defendants and the Garcinia Cambogia QE, allegedly packaged by defendants, and allegedly offered by Depasquale, is materially different than the Garcinia Cambogia QE actually packaged by defendants. Depasquale falsely claimed that her company "uses an invisible mark on all of our product packaging and has distribution contracts with our manufacturers that uses same invisible company mark on all items before they are sealed". Depasquale has no such distribution contract with defendants. Under those circumstances, the first sale doctrine does not apply and Depasquale's claims regarding the supposed invisible mark used by defendants are false, misleading and confusing and subject her to liability for trademark infringement.

Second, the first sale doctrine cannot possibly protect Depasquale from liability for creating a sham business purporting to sell Garcinia Cambogia QE, which was created for the sole purpose of disrupting the business of defendants and having nothing to do with selling any product, or violating Amazon's rules regarding drop shipping due to lack of inventory. Defendants certainly do not "believe that they are the only ones permitted to sell a product known as Garcinia Cambogia and that anyone who resells that product (at a higher price) even if that seller obtained it directly from Defendants commits trademark infringement" (Memo at 1). What they believe is that plaintiff should be held accountable for statutory violations and common law torts due to her unfair competition.  In adjudicating a motion to dismiss, the Court must accept any plausible factual allegation made by the party filing the pleading.

II.

## PLAINTIFF USED DEFENDANT'S MARK IN COMMERCE

Insofar as it is relevant to the present counterclaims, and contrary to plaintiff's claim, defendants did allege, both in the original and amended counterclaims, that plaintiff used defendant's mark in commerce.

After all, plaintiff's purport to sell Garcinia Cambogia, packaged by Quality Encapsulations ("Garcinia Cambogia QE") (including on Amazon), with defendants' mark on it (ACC Factual Allegations ¶49; OCC Factual Allegations ¶¶32, 33, 35-37, and counterclaim ¶¶ 14 and 19). She does not purport to offer any another

Garcinia Cambogia without defendants' mark.[5] The Mark is sufficiently distinctive to distinguish the user's goods from those of others, including by virtue of having acquired a secondary meaning in the minds of consumers (ACC Factual Allegations ¶49).

Defendants have registered a trademark to the logo, "Quality Encapsulations" (the "Mark", *see* copy annexed to counterclaims), which they place on Garcinia Cambogia QE, and have spent substantial sums advertising it (OCC Factual Allegations ¶33; ACC Factual Allegations ¶33).

A mark is presumed to merit protection when the plaintiff has a valid, registered trademark. An unregistered mark is entitled to protection under the Lanham Act if it is "sufficiently 'distinctive' to distinguish the [user's] goods from those of others." Star Indus. Inc. v. Bacardi & Co., 412 F.3d 373, 381 (2d Cir. 2005). Even if not inherently distinctive, a mark may be distinctive by virtue of having acquired a 'secondary meaning' in the minds of consumers." *Pan Am World Airways, Inc. v Flight 001, Inc.*, 2007 US Dist LEXIS 51012, at *31 [SDNY July 13, 2007].

---

[5]      Depasquale's argument to the contrary (Memo page 3 n. 2 and 7) is simply a misreading of the defined terms in the original counterclaims. Garcinia Cambogia, packaged by Quality Encapsulations was defined as "Garcinia Cambogia".  Ignoring the definition of the term, and using that term to mean any Garcinia Cambogia, Depasquale argues that defendants allege she sold "Garcinia Cambogia", which does not have defendants' mark and is sold by others . *Id*.

       But defendants actual allegation is that she purports to offer sell Garcinia Cambogia, which is defined as Garcinia Cambogia, packaged by Quality Encapsulations, which has defendants' mark on it.

       In the amended counterclaims, Garcinia Cambogia, packaged by Quality Encapsulations is defined as "Garcinia Cambogia QE". That product bears defendant's mark.

Defendants filed for the Mark on November 7, 2014. The Mark's registration date was July 28, 2015. But contrary to Depasquale's claims (Memo at 10), the Lanham Act protects unregistered trademarks. *Pan Am World Airways, Inc. v Flight 001, Inc.*, 2007 US Dist LEXIS 51012, at *31 [SDNY July 13, 2007]. Here Answering Defendants had filed for the mark prior to any of the events at issue.

According to Depasquale, defendants' product has been altered. Depasquale claimed, falsely and misleadingly, that her company "uses an invisible mark on all of our product packaging and has distribution contracts with our manufacturers that uses same invisible company mark on all items before they are sealed". Depasquale has no such distribution contract with Answering Defendants (OCC Factual Allegations ¶37; ACC Factual Allegations ¶48). Depasquale's claims regarding her mark are false, misleading and confusing. Moreover, they regard false assurances to consumers as to the authenticity and source of the product allegedly being offered, resulting in a false and misleading use of the Mark.

In general, "trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner." Zip Intern. Group, LLC v. Trilini Imports, Inc., 2011 U.S. Dist. LEXIS 55270, 2011 WL 2132980, *3 (E.D.N.Y. May 24, 2011) (quoting Polymer Tech. Corp. v. Mimran, 975 F.2d 58. 61 (2d Cir. 1992)); see also H.L. Hayden Co. of New York, Inc, v. Siemens Medical Systems, Inc., 879 F.2d 1005, 1023 (2d Cir. 1989) ("[T]he unauthorized sale of a

trademarked article does not, without more, constitute a Lanham Act violation."). This observation is sometimes referred to as the "first sale doctrine," insofar as it recognizes that "the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product." Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC, 562 F.3d 1067, 1071-72 (10th Cir. 2009); see also Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1301 (11th Cir. 2001): NEC Elecs. v. CAL Circuit Abco, 810 F.2d 1506, 1509 (9th Cir. 1987)). The Lanham Act does not give mark holders the right to control subsequent, non-authorized resales, as long as the product sold is genuine.

The rationale for this doctrine is that "trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold." NEC Elecs., 810 F.2d at 1509 (citing Prestonettes, Inc. v. Coty, 264 U.S. 359, 368-69, 44 S. Ct. 350 (1924)); see also H.L. Hayden, 879 F.2d at 1023 (when genuine article sold, no possibility of confusion exists). Thus, if a defendant does no more than stock and resell genuine trademarked goods, the mark holder does not have a right to stop it under the Lanham Act. See, e.g., Zip, 2011 U.S. Dist. LEXIS 55270, 2011 WL 2132980.

However, when a trademarked product that is being resold is "materially different" from the product as it is sold by the plaintiff, it is not a "genuine article." As

the Tenth Circuit explained in Beltronics, "A materially different product is not genuine

and may generate consumer confusion about the source and the quality of the

trademarked product." 562 F.3d at 1072.

> As the Tenth Circuit explained in Beltronics:
>
> A guiding principle in evaluating whether a difference
> between two products bearing the same trademark is
> material is whether the difference "confuses consumers and
> impinges on the . . . trademark holder's goodwill." . . .
> Although no mechanical process exists for determining the
> threshold for materiality, a difference is material if
> "consumers [would] consider [it] relevant to a decision about
> whether to purchase a product."

Because many factors influence such considerations, the threshold "must

be kept low to include even subtle differences between products." 562 F.3d at 1072-73

(quoting Davidoff, 263 F.3d at 1297, and Societe Des Produits Nestle, S.A. v. Casa

Helvetia, Inc., 982 F.2d 633 (1st Cir. 1992) ("Nestle")); see also Original Appalachian, 816

F.2d at 73.

Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC, held that a

physically identical product is nevertheless "materially different" from the genuine

article if "the bundle of services" that attach to the genuine article is not available to the

consumer. 562 F.3d at 1067; see also Original Appalachian, 816 F.2d at 68.

The Second Circuit in Original Appalachian also held that the

unavailability of certain services connected with a product can constitute a material

difference sufficient to defeat the application of the first sales doctrine. 816 F.2d at 68.

There, the court found that physically identical "Cabbage Patch Kids" dolls were

nevertheless materially different because the ones the defendant sold without

permission in the United States came with Spanish language "birth certificates" and

"adoption papers," whereas dolls sold through authorized dealers in the United States

came with English language paperwork. The reason for this discrepancy was that the

unauthorized dealer had imported dolls that were licensed for sale in Spain only — so-

called "gray market" goods.

When United States customers sought to register their Spanish language

birth certificates and adoption papers with OAA, the manufacturer refused; meanwhile,

customers who bought authorized Cabbage Patch dolls, and received English language

birth certificates, were allowed to participate in the registration process and all that it

entailed. Id. at 73.

The Second Circuit affirmed the District Court's finding that the

availability of the registration process was part of what consumers expected when

purchasing a doll. It explains the significance of these accessories:

> Purchasers of the dolls receive "birth certificates" and
> "adoption papers" to be filled out by the "parent" or owner of
> the doll, who takes an "oath of adoption." The adoption
> papers are returned to [the manufacturer,] OAA, and the
> information is entered into the OAA computer so that on the
> first anniversary of the adoption the adopting parent
> receives a "birthday card" from OAA. Judge Conner found
> that this adoption process is an "important element of the

> mystique of the [Cabbage Patch Kids] dolls, which has
> substantially contributed to their enormous popularity and
> commercial success."
> Id. at 70 (quoting 640 F. Supp. 928, 930 (S.D.N.Y. 1986)).
> Thus, the concealed fact that the unauthorized importer's
> dolls were ineligible for such services constituted a material
> difference that gave rise to a likelihood of confusion and
> damage to the plaintiff's goodwill. Id.; see also Zino, 571
> F.3d at 246 (alternative holding) (relying on "material
> difference" test to find liability for trademark infringement).

Here, Depasquale markets a product with Defendants' Mark, which is

materially different than the original, due to her unauthorized additional false

assurances of quality – that Defendants have placed an invisible mark on it – which are

material to consumers and cause confusion.  Defendants have alleged trademark

infringement.

<u>Conclusion</u>

For the reasons set forth above, plaintiff's motion should be denied in all

respects.

Dated: May 13, 2016

ANDREW CITRON
/s/Andrew Citron (phv08163)
30 Wall Street
8th Floor
New York, New York 10005
(212) 804–5759
Andrew.citron2@verion.net
Attorney for defendants

Daniel Green
Begos Brown & Green LLP

2425 Post Road, Suite 205
Southport, CT 06890
(203) 254-1904
Dgreen@bbgllp.com

<u>CERTIFICATION</u>

I hereby certify that on May 16, 2016, a copy of the foregoing was

delivered electronically to Attorney Gerald C. Pia, Jr. gpia@rochepia.com.

/s/___ Andrew Citron